OaRutiiejRS, J.,
delivered the opinion of tbe court.
Tbis is an action of trespass, for injury to plaintiff’s land. The object of the suit is to test the strength of title. An agreed case was made, which is as follows:
“It is agreed by the parties that the one thousand acre grant here filed, marked No. 1, under which the plaintiff holds title, has its beginning corner within the boundary of land subject to be surveyed by the surveyor of Allen county, Kentucky, but that the same extends over the line and covers the land for which defendant files grant No. 2, which is on the land in the district, subject to be surveyed by the surveyor of Monroe county, Kentucky. That the grants are each properly authenticated, and bear the date, as to their issuance, which they ought to do, and that each grant covers the land in dispute. If the one thousand acre' tract is properly located, then the title is in the plaintiff, otherwise the title is in defendant, to the extent of his patent. The one thousand acre patent was issued 5th March, 1841, the patent of defendant, 22d March, 1851. The decision of the court as to the validity of the two grants is to settle the rights of the parties to this suit, as though the titles had been regularly designed.” [Signed by the Attornies.]
The circuit judge, lipón these facts, decided in favor of the plaintiff, from -which the defendant appealed to this court.
*567 Tbe only question is, whether according to the laws of Kentucky that part of the plaintiff’s grant, which lies upon the land south of Monroe county, is not void, because of its contravention of an act of assembly of that State. This land lies in the disputed territory between the States of Kentucky and Tennessee.
When Kentucky constituted a part of Virginia, and Tennessee a part of North Carolina, the line between them was fixed at the parallel of thirty-six degrees and thirty minutes, north latitude. In 1779 and ’80, commissioners were appointed by those States, to ascertain and mark that line for the purpose of avoiding mistakes and disputes on the subject of titles derived from the different States. These commissioners, after running about forty miles of the line, westward from the beginning, disagreed and separated. The Virginia commissioners, however, extended the line thus begun, west to the Tennessee river. The North Carolina commissioners returned and ran a line about two miles north of the other, about half the distance to the river, giving to North Carolina, (now Tennessee,) that much additional territory. The first of these lines was called Walker’s and the other Henderson’s line. So there was a conflict of power to sell and grant land, between the two States, on the -whole length of this dividing line, over a territoy of two miles wide. Each State proceeded to grant the same lands to the people, then forming settlements in the west. North Carolina, however, in 1790, receded from Henderson’s and adopted Walker’s line. But as this was after her cession of the territory now constituting Tennessee, to the United States, her confirmation was not binding on Tennessee. Afterwards in 1803, Tennessee and Virginia made a *568 settlement of tbe dispute by running a line equi-dis-tant between Walker’s and Henderson’s lines, and validating titles from either State before that time granted. But in 1819, Kentucky, disregarding this last settlement, caused a line to be run on tbe parrallel of thirty-six degrees and thirty minutes. This was found to be some distance south of Walker’s line, and produced much confusion in the land titles, and great irritation on the borders of the two States. It now became necessary for decisive action by Tennessee, and the adoption of measures of peace, and a final settlement was the happy result. Each State appointed commissioners, who met and agreed upon, and signed a convention on the 2nd February, 1820, by which Walker’s line was made the boundary, from the eastern terminus of the north boundary of this State, to the Tennessee river; and from that to the Mississippi river, the line of Alexander & Munsell was established. By the fifth article of this convention, the vacant and unappropriated lands lying east of Tennessee, and between the parallel of thirty-six degrees and thirty minutes and Walker’s line, was made subject to the disposition of Kentucky, and her grants for the same were to be received as evidence of title in the courts of Tennessee; 2 Meig’s Dig., 106. So, it will be seen, that by this compromise and arrangement, the sovereignty of Tennessee was secured to Walker’s line, except the power to dispose of the vacant land, which was conceded to Kentucky.
Now, it only remains to be ascertained whether the one thousand acre grant, under which the plaintiff claims, is valid, to its full extent, according to her laws. The grant to Claiborne, of one thousand acres, begins south of Allen county, and passes over the dividing line into *569 the territory south of Monroe, and for this reason, it is said to be illegal and void as to Parker, the defendant, whose land is all south of Monroe, though held by a younger entry and grant. The whole question, then, in the case, is, as to the validity of Claiborne’s grant, upon the facts above stated.
The State of Kentucky passed an act as early as December, 1824, for the disposition of this land. In the ninth section, ch. 64, it is provided that “in performing the business of making the entries and surveys required by this act, they shall be bounded on the east and west by lines drawn at right angles from the extreme corners (in the State line) of these respective counties, south to the parallel of latitude of 36 deg. and 30 min. And it shall be no objection to an entry or survey, that it may begin in one of said divisions, and extend eastwardly or westwardly into another of said divisions of territory.”
So it will be seen that, by this law, although the entries and surveys are directed to be made-all south of some particular county, yet it does not constitute an objection to them, that they may fall into two of the divisions, as is the ease with the one thousand acre entry in question.
By an Act of 1835, ch. 815, the legislature gave the unappropriated land, north and east of the Tennessee river, to the respective counties in which they were situated, to such counties for the improvement of their roads and bridges. The power was given to the county courts to ' dispose of the lands, by entry and survey, and apply the proceeds as aforesaid. But still, grants were to be issued by the Begister, and of course signed by the Governor, on such surveys. It' is conceived *570 that tbe only change made by this act, was to vest the proceeds in the respective counties; and provides that the entries should be made under the authority, and by the agency of the county courts, instead of the State.
By the Act of 1836, ch. 271, § 1, the said vacant lands south of Monroe county, are given to her to improve her roads; and by the fifth section, those south of Allen, to her for the same purpose. Tet, the Begis-ter of the land office is to issue patents to enterers, as before. Now, from these acts, it is argued that inasmuch as the proceeds of the lands south of each county, must go to that county, that an entry beginning south of one, and extending into the territory south of the other, would be void, because the proceeds are appropriated to each; and this cannot be done, it is contended, if the same entry lies partly on the territory of both.
We cannot recognize the validity of this objection. The Act of 1824, ch. 64, § 9, first above referred to, has never been repealed; and that expressly allows, or at least saves from invalidation, this kind of entry. The main object of the subsequent acts, is to dispose of the proceeds to the counties for a particular purpose. The only question that could arise, would be, as to the price of the land. Allen and Monroe counties would be entitled, respectively, to the proceeds of that portion of the land embraced in said grants, which lay in the territory set apart to each. Taking all the acts together, they do not interfere materially with each other, and can all well stand together.
We know of no principle which would authorize us to take into view the misapplication of the proceeds of *571 land regularly entered and granted, in testing the validity of the titles. This would be unprecedented.
But, upon another ground, this title cannot be thus impaired. The grant is signed and issued by the Governor, under the great seal of the State, to the land then vacant; and in a contest with a younger enterer and grantee, it cannot be assailed by any defects that may have existed in the entry and survey. If any such exist, they are cured by the grant. In other words, we cannot go behind the grant, in cases like this, to search out irregularities or imperfections. The title stands upon the strength of the grant made by the sovereign authority of the State.
So, upon these grounds, we arrive at the conclusion that the older grant of Claiborne, for one thousand acres, must prevail over that of Parker, the defendant, for one hundred and twenty-seven acres, which is ten years younger.
Let the judgment of the circuit court be affirmed.